# PARISH *v.* CRAIG.

---

### CONTRACTS; CONSIDERATION; EVIDENCE; PLEADING.

The consideration named in a written contract to pay a person "in return for pecuniary and other aid rendered" a sum equal to 5 per cent of the gross amount ultimately allowed by the United States on a claim of the promisor, pending before Congress, will not be presumed to have been paid and received, but should be pleaded and proved in an action on the contract,—especially where the action is brought against the promisor's estate, and the promisee had been employed in the government service, and was therefore prohibited by express statute from rendering aid to anyone in the prosecution of a claim against the United States during such period of service, or for two years thereafter.

No. 2419. Submitted December 6, 1912. Decided February 26, 1913.

HEARING on an appeal by the defendant from a judgment of the Supreme Court of the District of Columbia, on verdict, in an action on a contract to pay a percentage of the gross amount recovered on a claim against the United States.          *Reversed.*

The COURT in the opinion stated the facts as follows:

The declaration of Annie F. Craig, administratrix of the estate of Samuel Ramsey, filed October 4, 1909, against Emily E. Parish, executrix of the will of J. W. Parish, alleged a promise by said Parish on October 9, 1900, in return for pecuniary and other aid rendered by Samuel Ramsey, to pay to said Ramsey an amount equal to 5 per cent of the gross amount that should ultimately be allowed to said Parish by the United States on a claim then pending in Congress, founded on a contract for furnishing ice to the Army in the year 1863. Parish died before the allowance of said claim, but the same was ultimately allowed to the amount of $181,358.95. In May, 1909, plaintiff demanded payment of 5 per cent of said amount, *viz.,* $9,067.94, which was refused. The declaration concluded with the ordinary common counts.

Ordered, on motion of the defendant, to file a bill of particulars, the plaintiff filed the following:

"1. A true and exact copy of the contract in writing referred to in plaintiff's affidavit attached to her declaration as follows:—

"October 9th, 1900.

"To whom it may concern:

"In return for pecuniary and other aid rendered to me, I promise to pay to Samuel Ramsey, of Washington City, District of Columbia, his heirs and assigns, an amount equal to 5 per cent of the gross amount ultimately allowed by the United States on my claim now pending in Congress, which is based upon a contract for furnishing ice to the Army in the year 1863.

"J. W. Parish.

"Witnesses: J. H. McGowan,
               Arthur N. Marr."

"2. Further, plaintiff states that on the following dates plaintiff's intestate advanced the sums of money mentioned respectively as follows: February 14, 1874, $100; January 20, 1875, $90; August 9, 1884, $15; September 29, 1900, $180; October

26, 1900, $900; as well as on divers other occasions and in divers other sums."

The sum claimed by the plaintiff is as follows:

"Estate of J. W. Parish to Estate of Samuel Ramsey, Dr., 1909, June 15.   To a sum equivalent to 5 per cent of $181, $358,95, being the gross amount allowed upon the J. W. Parish claim against the United States, due according to the agreement of October 9, 1900, hereinabove set forth, $9,067.94   To interest from June 15, 1909."

Two additional motions for a more precise statement of the particulars of demand were denied.   Defendant pleaded not indebted, no promise as alleged, limitation, and usurious consideration.   Upon issue joined the case was submitted to a jury who returned a verdict for the plaintiff for $9,067.94, with interest from June 15th, 1909.

For the plaintiff, A. W. Serven testified that he had been a partner of Judge McGowan, who, until his death in 1909, had been the chief attorney for Parish in the matter of his ice claim, was familiar with Parish's handwriting, and recognized his signature to the instrument sued upon; which instrument was offered in evidence.   Witness was of the impression that the instrument was written in McGowan's office.   After an auditor's report on the claim there was a consultation in McGowan's office concerning those who were entitled to compensation for services, and a pencil memorandum was made of names and amounts. Ramsey's name was included, but amount not remembered; recollection was that it was "several thousand dollars."   Parish had been without means and several persons had contributed to keep him going during the fifteen years of effort to procure the payment of his claim.

Another witness, Morey, who had been associated with McGowan in the last years of the prosecution of the ice claim, testified that Parish had been impecunious.   That he was incompetent to make computation of the various elements of his claim, which was not an easy thing to do.   That Parish told him Ram-

sey had made a computation, and often referred to the Ramsey figures.    Told him that Ramsey had carefully gone over the figures and made the amount due him between $300,000 and $350,-000.    Does not know when the computation was made, or whether Ramsey was employed in the Surgeon General's Office when he made it.    It was very early in 1900, or previous thereto, that Parish first spoke of it.    A law clerk in the surgeon general's office testified that Ramsey had been chief clerk in that office and in charge of the finance division; and that the character and details of Parish's claim would have been committed to him.    Shown a letter of the Surgeon General, dated May 25, 1884, appended to a report of the House Committee on Claims of the 57th Congress, which letter goes into details regarding the manner of supplying ice, etc., witness said that this statement appeared on the records of the finance division that was under Ramsey's direction.    Ramsey resigned his position June 30, 1894.    A witness testified to the excellent character of Ramsey for integrity.    Plaintiff testified that her daughter married Ramsey's son about twenty-one years before the trial which occurred in December, 1911.    That the fact that Ramsey had some connection with Parish's claim had been matter of family talk.    She said, on cross-examination, that she had certain notes or papers, found after Ramsey's death, representing the several items in the bill of particulars.    These she had delivered to her counsel.    They were not introduced in evidence. It was admitted that the sum of $181,358.95 had been paid to defendant under a judgment of the Supreme Court of the United States directing the payment of that sum under the act of Congress allowing the claim.    Defendant introduced the following letter from Ramsey to Parish;

War Department,
Surgeon General's Office,
Washington, D. C., July 13, 1886.

My dear Mr. Parish:—

You have several times asked me to prepare a memorandum of certain small money transactions of the last few years.    So,

having a little spare time this rainy day, I think I shall comply. I find that I have two notes and a draft, which, with interest on the notes, are:

Note of February 14, 1874 .........$100
Interest 10 per cent to July 14, 1886 .. 124
Note of January 20, 1875 .......... 90
Interest 10 per cent to July 15, 1886 .. 103
Draft of August 9, 1884 ........... 15

　　　　　　　　　　　　　　　　　$432

One note is lost. My recollection is that it was for $50, and was some eight or nine years ago; but on that I am not certain.

You will see that the rate of interest (which was your doing, and not mine) is excessive and too much for anyone to pay. If you should find that you could afford to offer me $400 or any part or portion thereof, under my present circumstances, I should not refuse.

　　　　　　　　　Yours truly,

　　　　　　　　　　　Samuel Ramsey.

Another from the same to the same, from Baltimore, dated November 29, 1900, from which parts are extracted, as follows:

"Baltimore and two removals have thus far proved a hard bargain, and I am getting to be financially unsound, and consequently alarmed. If by your mining speculations or any other means you can spare me $150, or any sum greater or less, it will be a relief. I will then give a receipt.

3. Congress will be with you next Monday, but you will naturally need some time to feel its pulse. If you have any means of doing it, make lists of those who will favor you, or at least not oppose you.

4. It is important to get your bill through the Senate as early as possible. That would improve your standing in every way. The House would do quite as well.

5. You may recall that on two occasions you were allowed the exact amounts that I computed; hence my estimate may have

some significance.   Stone made the amount $128,000 and odd;
I say that in justice it should be about $300,000.   But that
should remain a profound secret, known only to yourself, Mc-
Gowan, and me.

6.  If prospects be bright, plenty of hangers-on will proffer real
or pretended help for 50, 25, 20, or other per cent of the pro-
ceeds.   Give no percentages.   Say in general terms that even if
the bill passes, the amount is uncertain; that it has been spoken
of as about $100,000; that you are willing to give that amount
for really effective help, if it should become necessary; but that
even that sum may have to be divided among several."

Defendant read extracts from the record in the case of Parish
against the Secretary of the Treasury, in which the payment to
Parish was finally decided.   The act of May 31, 1872, and the
action in the court of claims thereunder.   The act of February
18, 1885, directing payment to Parish of the additional sum of
$58,341.85, found by that court.   The report of the House com-
mittee on claims, made May 19, 1902, in support of the bill
which became a law on February 19, 1903, in which the bill was
stated as directing the Secretary of the Treasury to make exami-
nation of the claim under the rule of damages prescribed in
*Behan* v. *United States,* 18 Ct. Cl. 687.   The report of the
auditor of the War Department, finding due Parish under the
rule of said act of February 17, 1903, the sum of $181,358.95.
The report of the court of claims under the first reference, of
$10,444.91.   The report of the Surgeon General, made to Con-
gress on a bill to again refer the claim, showing that 17,232 tons
of ice had been lost to Parish, and the cost thereof.   The report
of the War Department that Parish was entitled, in addition to
the $10,444.91 previously awarded by the court of claims, to
the sum of $58,341.85 for the ice lost.   The act of February
20, 1886, appropriating the money to pay said last-named sum.
Also the subsequent report and act of 1903, directing the pay-
ment of an additional sum, which was found to be the sum of
said final payment; namely, $181,358.95.

The following extract from a letter of Ramsey to Parish,
dated April 7, 1877, was read:   "If you could oblige me with

$100 as a loan, contribution, or whatever you may choose, I think I could get along."

Upon the close of the testimony, defendant moved the court to direct a verdict because no legal cause of action was set forth, and the consideration set out in the contract alleged, *viz.,* "pecuniary and other aid," throws no light on the nature of the contract or on the service to which said contract related. Because there was no proof offered of a valid consideration of the contract, and no proof that "pecuniary or other aid" had been furnished. Because the action is for services in the prosecution of a claim before Congress, and the nature of the same was withheld. Because the paper sued on is for an executed consideration, and called for pleading and proof that the original consideration was one that the law would enforce. Because the paper in suit was drawn between principal and agent, and was intended as remuneration for past services, and it was essential to show the existence at the time of a just and moral obligation; none of which was done. Because the imputation of illegality cast upon the paper put upon plaintiff the burden of disproving the imputation, and no evidence to that effect had been offered. The motion was denied and exception noted.

The court instructed the jury at request of plaintiff:

1. "If the jury find from the evidence that defendant's testator executed the contract of the 9th of October, 1900, then, in the absence of proof that illegality entered into the consideration of the contract, the plaintiff will be entitled to your verdict."

2. "That the promise to pay was made in consideration of pecuniary and other aid is prima facie evidence of consideration, and unless evidence is given of facts tending to show that there was no legal consideration for the contract, your verdict should be for the plaintiff."

3. "Mr. Ramsey had the right, while in the employ of the government, to lend or give money to Parish, so long as they were not connected with the prosecution of Parish's claim against the United States. Mr. Ramsey had the right after two years had expired from his retirement from office to use his

knowledge, gained while in the government employ, to make computations or to furnish other aid and assistance to Parish in the prosecution of his claim."

Exceptions were reserved by defendant to those several instructions.

In the general charge it was said: "The law would presume that the consideration named had been paid to, and received by, Parish."

The defendant moved for judgment notwithstanding the verdict, and in arrest of judgment, both of which motions were denied, and judgment was entered on the verdict for the plaintiff.

*Mr. Holmes Conrad* and *Mr. Leigh Robinson* for the appellant.

*Mr. Frank W. Hackett* for the appellee.

Mr. Chief Justice SHEPARD delivered the opinion of the Court:

We are of the opinion that it was error to charge the jury that the law presumed the consideration named in the contract in action had been paid and received; thereby making a prima facie case entitling the plaintiff to a verdict in the absence of proof of illegality.

It is the settled rule of the common law—changed now by statute in some of the States, but not in this jurisdiction—that except in the case of sealed instruments, negotiable bills and notes, the consideration therefor is not presumed or implied, but must be proved.  *Lansing* v. *M'Killip,* 3 Caines, 286–288; *Curley* v. *Dean,* 4 Conn. 259–265, 10 Am. Dec. 140; *Bailey* v. *Bussing,* 29 Conn. 1–6; *Beauchamp* v. *Bosworth,* 3 Bibb, 115; *Shelton* v. *Bruce,* 9 Yerg. 24–26; *Brown* v. *Parks,* 8 Humph. 294–297; *Moore* v. *Waddle,* 34 Cal. 145–147; *Davis* v. *Stout,* 126 Ind. 12, 22 Am. St. Rep. 565, 25 N. E. 862.

The consideration for a contract like this should be pleaded

in order that the court may be informed as to its legal sufficiency, and the defendant of what he has to disprove. *Moore* v. *Waddle* and other cases cited *supra.*

A further exception has been maintained in some instances where the non-negotiable contract contains the recital "for value received," or "for a valuable consideration." *Frank* v. *Irgres,* 27 Minn. 43, 6 N. E. 380; *Whitney* v. *Stearns,* 16 Me. 394.

It is not necessary to discuss or take issue with the doctrine of those cases which treat such recitals as explicit admissions of a valuable consideration for the promise, for the reason that there is no such recital in this contract. Its recital—"In return for pecuniary and other aid rendered to me"—has no such common or technical meaning. It can only be made certain by pleading and proof. The application of the general rule before stated, both in respect of pleading and proof of the substantial elements of the actual consideration, in the present case, is particularly apt. In the first place, the signer of this unilateral contract having died before action brought, the representative of his estate ought to be informed of the elements of the entire consideration, both as regards the nature and character of the pecuniary aid, and the other aid in addition thereto, if those last words have any real significance. Again: At the time of certain items of money advanced, as given in the bill of particulars, the plaintiff's intestate was in the service of the United States; during which period and for two years after his retirement therefrom, he was prohibited by express statute from rendering aid to anyone in the prosecution of a claim against the United States. It is quite true, as stated by the court in one of the special instructions, that one in the government service is not, for that reason, denied the right to give or loan money to a needy friend for his subsistence, or that of his family. But it must not have been furnished to aid him in the prosecution of a claim against the United States. Even if pecuniary aid was extended in this instance for a legal and proper purpose, the contract for payment therefor out of the proceeds of said claim, when allowed, included nevertheless, other aid as a part of the consideration of the promise. If such other aid consisted in

furnishing information derived from the records of his office, and making computations therefrom of the damages sustained by the claimant, while in the service, or within two years after retirement therefrom; or other aid, during the same period, in the efforts of claimant to obtain legislative recognition and payment, aid of such character was in violation of law, and no lawful promise could be based upon such a consideration. "Every part of the consideration goes equally to the whole promise; and therefore, if any part of it is contrary to public policy, the whole promise fails." *Hazelton* v. *Sheckells,* 202 U. S. 71–78, 50 L. ed. 939–941, 26 Sup. Ct. Rep. 567, 6 Ann. Cas. 217.

We deem it unimportant, as well as unnecessary, to pass upon the other questions that have been raised. That the cause will be tried again is a sufficient reason for refraining from passing upon the motions to direct a verdict, and for judgment notwithstanding. A different state of facts may be presented on another trial. It may be remarked also that some of the assignments of error are subject to the objections presented thereto, for want of particularity of statement.

For the error that has been pointed out in giving the instructions to the jury that were excepted to, the judgment will be reversed with costs, and the cause remanded with direction to set aside the verdict and grant a new trial.          *Reversed.*

A motion for a rehearing was overruled May 26, 1913, and a motion to recall the mandate denied June 2, 1913. A motion for modification of opinion was denied June 2, 1913.